IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PUBLIC INTEREST LEGAL
FOUNDATION, INC.

       **Plaintiff,**

v.                                 **Case No.:  1:23-cv-00169-MLG-JFR**

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of New Mexico,

       **Defendant.**

DEFENDANT'S RESPONSE TO PUBLIC INTEREST
LEGAL FOUNDATION'S MOTION FOR SUMMARY JUDGMENT

Defendant Maggie Toulouse Oliver (Oliver), in her official capacity as Secretary of State

of New Mexico (NMSOS), by and through counsel, respectfully submits this Response opposing

Plaintiff Public Interest Legal Foundation, Inc.'s (PILF) Motion for Summary Judgment. Doc. 37.

Oliver requests that the court deny PILF's motion and grant summary judgment for Oliver, the

nonmovant, pursuant to Fed. R. Civ. P. 56(f).

INTRODUCTION

PILF takes the extreme position that Congress intended to preempt New Mexico statutes

and policies related to data fees for electronic requests for a state's entire voter file with the 1993

passage of 52 U.S.C. § 20507(i)(1) of the National Voter Registration Act (NVRA). Such a ruling

would require the court to conclude that the Public Disclosure Provision of NVRA (Section 8(i))

evidences a Congressional intent to mandate that state election officials must provide an entire

voter file, without charge, to anyone requesting it in electronic format. Therefore, this Court must

determine whether Congress, when passing the NVRA, intended the language found in Section 8(i) to preempt New Mexico's data fees for voter file requests.

In their Motion, PILF presents the contradictory arguments that the plain language of Section 8(i) supports express preemption and yet simultaneously asks the court to write a silent prohibition on charging data fees for voter file requests into Section 8(i).  Section 8(i) contains no express prohibition to NM's fee schedule and even explicitly provides that state may charge "a reasonable cost" for photocopying, the main technology for sharing information in 1993. Further, PILF argues for both field preemption and conflict preemption even though state-wide voter files were largely non-existent at the time that the NVRA was enacted. The history and purpose of the NVRA fail to reveal any Congressional intention to occupy the field so thoroughly that New Mexico is precluded from charging reasonable data fees for electronic voter file requests. New Mexico's data fee schedule for electronic requests also does not conflict with Congress's general purpose in enacting Section 8(i) of increasing voter participation and protecting the integrity of the electoral process and accuracy of the voter registration lists by stopping arbitrary voter roll "purges."

## STANDARD OF REVIEW

"Summary judgment is appropriate where a movant shows 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Mirabal v. Envoy Air, Inc.*, Case No. 1:17-CV-0180-SWS-MLC, 2018 U.S. Dist. LEXIS 225005, *19 (D.N.M. Nov. 2, 2018) (quoting Fed. R. Civ. P. 56(a) (2010)). A dispute is genuine if there is "sufficient evidence so that a rational trier of fact could resolve the issue either way" and fact is material if "under the substantive law it is essential to the proper disposition of the claim." *Id.* (quoting *Crowe v. ADT*

*Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). "Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (citation omitted) (internal quotation marks omitted).

In determining whether evidence supports a party's factual claim, courts view evidence and draw reasonable inferences in a light most favorable to the nonmoving party. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011); *accord Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) ("The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment."). Only after "the moving party has properly supported its motion for summary judgment, [does] the burden shift to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Sally Beauty Co. v. Beautyco, Inc.,* 304 F.3d 964, 971 (10th Cir. 2002) (citation omitted).

**THE UNDISPUTED FACTS SUPPORT SUMMARY JUDGMENT FOR THE NMSOS**

The NMSOS does not dispute PILF Statements No. 1-8, 10-15, and 17-18. The NMSOS responds to the remainder of PILF's alleged "Undisputed Material Facts" as follows:

PILF Statement No. 9: In PILF's Interrogatory No. 1, Oliver was asked to describe the basis for the SERVIS data fees, which she understood to mean, in part, the origin of the dollar amounts charged and the specific calculations behind those origins. Oliver does not deny that her complete answer was "The fee schedule contained in this interrogatory was in place before Secretary of State Maggie Toulouse Oliver took office in 2016. No current member of the SOS staff has any knowledge of the basis upon which this legacy schedule was implemented." Doc.

37-1, at 26. However, other than their question about the steps involved in responding to a request for the Voter File in Interrogatory No. 3, PILF has not asked for the current calculations of costs or overhead justifying the data fees or for any detailed information regarding the budget amounts the NM Secretary of State devotes to maintaining SERVIS and responding to Voter File requests.

PILF Statement No. 16: While Oliver does not believe that the NVRA public disclosure provision preempts or precludes the fee schedule applied to Voter File requests, the letter PILF cites does not claim that New Mexico does not have to disclose the Voter File nor does it refuse to disclose the Voter File to PILF. In that letter, Mr. Lange states, "Though you provided some case law which you believe is relevant to making such a request under the NVRA, none of it provides a legal basis for our office to rely on in providing the actual voter file at a lower cost than any other requester." Doc. 37-1, at 20.

A. **Additional Material Facts Support the Reasonableness of the NMSOS's Fee Schedule**

Additional Material Fact A: The NMSOS incurs costs of $144,000 - $160,000/year for ongoing SERVIS maintenance and support in order to maintain the voter file so that it can be produced in response to requests. *See* "Information Technology Agreement" between Knowink LLC and the NMSOS dated March 2, 2022 thru February 28, 2026, at the page bates stamped SOS_00052 and attached as **Exhibit 1**.[1]

---

[1] Pursuant to D.N.M.LR-Civ. 10.5, Defendant has only attached only the title page and scope of work for this contract. While Plaintiff failed to adhere to D.N.M.LR-Civ. 10.5 instruction to file only those pages of an exhibit which are to be brought to the court's attention, Defendant cites to their exhibits throughout this document pursuant to D.N.M.LR-Civ. 10.7.

**ARGUMENT**

1.      **The Established Federal Preemption Analysis Regarding Laws Passed Pursuant to the Elections Clause of the U.S. Constitution, Such As NVRA, Does Not Invite a Lower Standard for Implied Preemption**

The Elections Clause of the U.S. Constitution "empowers Congress to 'make or alter' state election regulations" such that the typical presumption that Congress did not intend to preempt state law unless they expressed a clear purpose to do so is not applicable when Congress acted under that Clause. *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1, 14, 133 S. Ct. 2247, 2257, 186 L. Ed. 2d 239 (2013) (quoting Art. I, § 4, cl. 1). However, the lack of a presumption *against* preemption simply means that federalism concerns are weaker, not non-existent. A lack of presumption against preemption is not a presumption <u>for</u> preemption and so does not invite the court to throw away the "reasonable assumption…that the statutory text accurately communicates the scope of Congress's pre-emptive intent. *Id*. ("In sum, there is no compelling reason not to read Elections Clause legislation simply to mean what it says.").

Congress reveals its intent in three ways, one express and two implied: 1) when Congress explicitly articulates the extent to which a federal statute preempts state law (express preemption); 2) when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and 3) when state law actually conflicts with federal law" (conflict or obstacle preemption). *English v. Gen. Elec. Co.,* 496 U.S.72, 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Field Preemption has been described as existing "where Congress creates a scheme of federal regulation so pervasive as to leave no room for supplementary state regulation." *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 109, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Conflict preemption exists when compliance with a state law would conflict with or

prevent the accomplishment of the purpose of a federal law. *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1206 (D.N.M. 2010), on reconsideration regarding first amendment claims, No. CIV 08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010) ("Implied conflict preemption is found when it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (internal cites and quotes omitted).

**2.      Whether Congress Intended Section 8(i) to Mandate the Production of a State's Entire Voter File is Not a Controversy Before the Court in This Case**

Neither the U.S. Supreme Court nor the Tenth Circuit have decided the question of whether Congress intended to include statewide voter file as part of "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" or whether Congress intended to completely prohibit states from imposing any restrictions or requirements on the production of the entire voter file. 52 U.S.C. § 20507(i). But because Oliver has never refused to provide the statewide voter file to PILF provided they make the requested payment, <u>that question is not properly presented by the facts and circumstances of this case and the court should not decide that issue in the absence of a genuine dispute</u>. New Mexico law provides for the production of the entire state voter file in NMSA § 1-4-5.5(A) and PILF has met all the conditions except for payment of the fees. Therefore, an analysis as to whether the NVRA requires the State of New Mexico to produce the entire statewide voter file is a hypothetical question and not necessary to reach the merits of the actual controversy in this case. *United States v. Burlington Northern R.R.*, 200 F.3d 679, 699 (10th Cir. 1999) ("It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies."); *See also Calderon v. City & Cnty. of Denver*,

855 F. App'x 438, 447 (10th Cir. 2021) "This is especially so when the record reveals strong reason to believe the question this court is asked to answer is entirely hypothetical and divorced from the true state of facts before the court.")

To be clear, Oliver is not conceding that Section 8(i) preempts state law or that it mandates the production of the entire voter file generally. Conditioning the production of the voter file on payment is not the same thing as refusing to produce the voter file. The only question truly before the court in this case is whether Congress intended Section 8(i) to preempt any charges for electronic voter file requests. No previous court in the country has considered or answered the very narrow preemption question presented by the facts and PILF's claims in this case.

**3.     Congress Provided No Express Mandate that States Produce Electronic Voter Files Without Charge and There is No Evidence Congress Implicitly Intended the Public Disclosure Provision of the NVRA to Preempt State Laws and Policies Regarding the Cost Associated with Producing Statewide Voter Files**

As a preliminary matter, PILF overstates the clarity of Section 8(i) in the conclusory and unsupported statement "[t]hese data fees contravene the NVRA's plain text…" Doc. 37, at page 15. However, there is no language prohibiting state election officials from charging reasonable costs for electronic voter files in Section 8(i). The text is ambiguous, at best, regarding whether state election officials are even required to produce the entire, statewide voter roll. And not only is there no directive to produce electronic documents without charge but there is language allowing the opposite:

(i)      Public disclosure of voter registration activities

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, *photocopying at a reasonable cost*, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official

lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C.A. § 20507 (Emphasis added).

PILF urges an extremely narrow reading of the word "photocopying" to exclude electronic copies while simultaneously urging a reading of the word "all records" so broad that they imply a court need not engage in any context specific preemption analysis. The district court in New Jersey rejected this broad interpretation of "all records" when it ruled that New Jersey's instruction manual containing technical instructions of how a user was to operate or modify the electronic database that served as the official repository for the voter registration system was not subject to disclosure. *Pub. Int. Legal Found., Inc. v. Way*, No. CV 22-02865 (FLW), 2022 WL 16834701, at *5 (D.N.J. Nov. 9, 2022) ("Although Plaintiff is correct that the NVRA's disclosure provision is broad and does not contain an explicit exemption from disclosure for sensitive information subject to potential abuse, I also find that the term "all records" in the disclosure provision "does not encompass any relevant record from any source whatsoever, but must be read in [context] with the various statutes enacted by Congress ....") (quoting *Pub. Interest Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021)).

In *Am. Ass'n of People with Disabilities v. Herrera,* the District of New Mexico ruled that New Mexico laws restricting voter-registration activities of third parties were not expressly preempted by NVRA's expansive voter registration requirements because, like here, that subsection of the Statute explicitly acknowledged space for state action. *Herrera*, 690 F. Supp. 2d 1183, 1225 (D.N.M. 2010). In that case, four nonprofits challenged NMSA 1978, § 1–4–49 and

its implementing regulations requiring third party voter registration agents to pre-register with the

state and attend a training. *Id.* at 1189. The court reasoned that:

> A plain reading of the NVRA and NMSA 1978, § 1–4–49 reveals no explicit conflict between the federal statute and the state law. The NVRA contains no language stating that it expressly preempts state voting registration requirements. To the contrary, the plain text of the NVRA expresses a desire to function alongside state voter-registration requirements, stating:
>
> Except as provided in subsection (b) of this section, notwithstanding any other Federal or State law, *in addition to any other method of voter registration provided for under State law,* each State shall establish procedures to register to vote in elections for Federal office—
>
> > (1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 1973gg–3 of this title;
> >
> > (2) by mail application pursuant to section 1973gg–4 of this title; and
> >
> > (3) by application in person—
> > > (A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and
> > > (B) at a Federal, State, or non-governmental office designated under section 1973gg–5 of this title.
>
> 42 U.S.C. § 1973gg–2(a), transferred to 52 U.S.C.A. § 20503 (emphasis added). The NVRA explicitly provides for state regulations for voter registration. The Court believes § 1–4–49 fits squarely within the NVRA's acknowledgment that states may have their own voting regulations. The Court finds that the NVRA does not explicitly preempt § 1–4–49.

*Id*. at 1225.

Similarly, the text of Section 8(i) of the NVRA explicitly acknowledges the need for states

to charge "reasonable costs," flying in the face of PILF's assertion that the plain text is evidence

of Congressional intent to expressly preempt state's discretion to charge fees for the production of

records related to voter registration programs and activities much less the entire voter file.

By attempting to add burdens not found in the text of Section 8(i), PILF asks the court to alter, rather than interpret the NVRA. It is a fundamental principle of statutory interpretation that "absent provision[s] cannot be supplied by the courts." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012); *See also S. Furniture Leasing, Inc. v. YRC, Inc.,* 989 F.3d 1141, 1147 (10th Cir. 2021) (quoting *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1738, 207 L. Ed. 2d 218 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.")). To do so "is not a construction of a statute, but, in effect, an enlargement of it by the court." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61, 205 L. Ed. 2d 291 (2019) (quoting *Nichols v. United States*, 578 U.S. 104, 110, 136 S. Ct. 1113, 1118, 194 L. Ed. 2d 324 (2016)). This principle applies not only to adding terms not found in the statute, but also to imposing limits on a state and state agency's discretion that are not supported by the text. *See Watt v. Energy Action Ed. Foundation*, 454 U.S. 151, 168, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981).

   a.  **The Court May Also Look to the History and Purpose of the NVRA Because the Text of Section 8(i) is silent regarding the production of an entire statewide voter file much less the charges a state may charge for its electronic production**

Since the text of Section 8(i) is silent regarding the whether states must produce the entire voter file for free, the court should look beyond the text. *Cf. Watson v. Philip Morris Cos*., 551 U.S. 142, 147, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007) (using the "text's language, context, history, and purposes" to guide interpretation of the federal officer removal statute). "The goal of statutory interpretation is to ascertain the congressional intent and give effect to the legislative will." *In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018) (internal quotation marks omitted). "In conducting

this analysis, we first turn to the statute's plain language," *Id.,* as "[a] statute clear and unambiguous

on its face must be interpreted according to its plain meaning," *In re Geneva Steel Co.,* 281 F.3d

1173, 1178 (10th Cir. 2002). "The plainness or ambiguity of statutory language is determined by

reference to the language itself, the specific context in which that language is used, and the broader

context of the statute as a whole." *Ceco Concrete Const., LLC v. Centennial State Carpenters

Pension T*r., 821 F.3d 1250, 1258 (10th Cir. 2016) (quoting *Robinson v. Shell Oil Co.,* 519 U.S.

337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).

      If statutory meaning cannot be derived "merely by reference to the text, a court may also

look to traditional canons of statutory construction to inform their interpretation," *Conrad v. Phone

Directories Co.,* 585 F.3d 1376, 1381 (10th Cir. 2009), and "may seek guidance from Congress's

intent, a task aided by reviewing the legislative history," *In re Geneva Steel Co.,* 281 F.3d at 1178.

"Ambiguous text can also be decoded by knowing the purpose behind the statute." *Id*.

**b. The Historical Context and Legislative History of the NVRA Reveal the Absurdity of PILF's Field Preemption Argument That Congress Intended to "Occupy the Field" Regarding the Production of a Statewide Voter Files Or to Dictate That a State May Charge Nothing for that Production if it's Electronic**

      Prior to the NVRA's enactment, some county election officials would remove registered

voters from the rolls "merely because they failed to cast a ballot in a recent election." S. Rep. No.

103-6, at 17 (1993). The basic rights of minority citizens in some communities were threatened by

states that engaged in purges of the voter rolls. *Id* at 18. In response, Congress enacted the NVRA

with the following four express purposes: "(1) to establish procedures that will increase the number

of eligible citizens who register to vote in elections for Federal office; (2) to make it possible for

Federal, State, and local governments to implement this subchapter in a manner that enhances the

participation of eligible citizens as voters in elections for Federal office; (3) to protect the integrity

of the electoral process; and (4) to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501. This court has acknowledged that these stated purposes include both "a generalized purpose of increasing voter participation, but also protecting the overall integrity of the electoral process and the accuracy of the voter-registration rolls" and that nothing in the text or legislative history of the NVRA suggests that one is more important than the other. *Herrera*, 690 F. Supp. 2d at 1226.

The *Herrera* court also summarized the set of new requirements the NVRA created for states in the following manner:

> The NVRA, which Congress enacted in 1993, requires States to provide simplified systems for registering to vote in federal elections. The States must provide a system for voter registration by mail, a system for voter registration at various state offices (including those that provide "public assistance" and those that provide services to people with disabilities), and a system for voter registration on a driver's license application. The NVRA specifies various details about how these systems must work, including, for example, the type of information that States can require on a voter registration form. It also imposes requirements about just when, and how, States may remove people from the federal voter rolls. The NVRA adds that it does not "supersede, restrict or limit the application of the Voting Rights Act of 1965," and that it does not "authorize or require conduct that is prohibited by the Voting Rights Act of 1965."

*Herrera*, 690 F. Supp. 2d 1183, 1204 (D.N.M. 2010) (citations omitted).

The NVRA contains no provisions related to or referencing centralized voter rolls. Additional historical context regarding election systems at the time of NVRA's passage reveals how misplaced PILF's overly expansive interpretation of Section 8(i) is in this case. When the NVRA (commonly known as the "Motor-Voter Act" prior to passage) was enacted in 1993, all but one state lacked centralized state-wide voter files much less electronic ones. In fact, prior to the passage of the Help America Vote Act in 2002 (HAVA), 52 U.S.C.A. § 20901 et seq., the majority of voter registration lists were maintained by thousands of local counties and towns, not states. *See*

Page 29 of "Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process" (2001) (also known as the Carter-Ford Commission) ("Thus we have created a system where voter registration is relatively easy and permanent but is still usually recorded and maintained in the separate files of the nearly 13,000 local election jurisdictions of the United States."). After the 2000 presidential election and the ensuing *Bush v. Gore* Supreme Court decision, Congress passed HAVA which directed every state to create "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State …" by 2006. 52 U.S.C.A. § 21083(a)(1)(A). New Mexico began efforts to establish a statewide, central database for all voter registration information in 1999 and by 2004, 16 of its 33 counties had converted their local systems to this central database. *See* page 4 of "New Mexico State Plan" published in the Federal Register on March 24, 2004 as "Publication of State Plans Pursuant to the Help America Vote Act," 69 FR 14002-02.

In HAVA, while mandating that states create centralized voter files, providing appropriations to help cover the technological costs, and creating an Election Assistance Commission to serve as a national clearinghouse of information, Congress left the majority of the details regarding election administration largely to the states and expressly declined to "occupy the field" of centralized voter files. Congress limited the scope of HAVA, clarifying that "[t]he requirements established by [HAVA] are minimum requirements and nothing in [HAVA] shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under [HAVA] so long as such State requirements are not inconsistent with the Federal requirements under [HAVA] or any law

described in section 21145 of this title." 52 U.S.C.A. § 21084. Section 21145 is HAVA's savings clause: it provides that except for the changes to the NVRA specified in HAVA, "nothing in this chapter may be construed to authorize or require conduct prohibited under [a number of federal laws, including the NVRA], or to supersede, restrict, or limit the application of such laws." 52 U.S.C. § 21145 (a).

The legislative history of the NVRA likewise contains no evidence of Congressional intent to occupy the field and prevent states from enacting laws related to centralized voter rolls, including fee schedules for Voter File requests. Before the NVRA's passage, there were lengthy debates, Congressional testimony, and no small number of speeches expressing deep concerns regarding the burdens it would create for states. Congressman Bob Livingston, for example, was particularly alarmed by the prospect of creating new and draconian costs for the states due the imposition of new federal requirements on state and county agencies and election officials without any corresponding appropriation to cover those expenses:

> ...welfare providers and unemployment administrators are going to have to be trained as registrars. The bill requires the welfare agencies to provide the same degree of assistance to voter registration applicants that they provide to welfare applicants. In other words, they have to wear two hats. The unemployment bureau clerks are going to have to put on their unemployment hat and fill out those forms, and then their registrar of voters hat and fill out those forms. It is going to take money, time, and resources away from those agencies, away from all of those offices throughout America in order to do something they never even envisioned that they were supposed to do because the Congress has said it is the new law.

139 Cong. Rec. H288-01, 139 Cong. Rec. H288-01, H294, 1993 WL 15800, at 4:30pm. And yet, throughout extensive debate regarding the financial burden being shifted to the states, the costs of producing the entire voter file electronically to anyone who demanded it were never raised by a single opponent to the Motor-Voter Act/NVRA. This is likely because that topic wasn't part of the

legislation and wouldn't be a topic of legislative enactment for another nine years. The focus of NVRA was restricting the conditions under which local election officials could remove people from the voter rolls as well as making counties and states allow for voter registration at motor vehicle offices, by mail, and at other local agencies. *See* 52 U.S.C. §§ 20507(d) and 20504 thru 20506.

PILF's field preempt argument is twofold: 1) because Congress specifically referenced reasonable costs for photocopying, they intended every other form of document production to be free of charge; and 2) Congress didn't include a separate detailed cost provision in NVRA like they did in the Freedom of Information Act. PILF urges the court to dismiss the "reasonable cost" language in Section 8(i) by claiming the word "photocopying" means states can only charge for hardcopy, or paper, requests and so must charge nothing for electronic production. Doc 37 at 17. This reading of Congress' silence regarding electronic records is untethered from the reality of voter registration record-keeping in 1993. As explained above, statewide electronic voter files did not exist at the time of the passage of NVRA and many counties were still using manual punch card machines.

PILF also relies on *Project Vote v. Kemp* to argue that the absence of a separate cost provision indicates that Congress intended to prohibit charges by states for the entire voter file because "…Congress intended states to shoulder the burden." Doc 37 at 18. However, the *Kemp* case involved the State of Georgia refusing the disclose records that documented the reasons the state rejected or cancelled certain voter registration applications after Project Vote received complaints of potentially discriminatory practices. *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1331 (N.D. Ga. 2016). The court found that disclosure of eleven out of fourteen categories

of requested information about rejected voter registration applications, the reasons they were rejected, and the individual applications was "encompassed by the Section 8(i) disclosure requirements" to ensure "voting regulation programs and activities…are not executed in a manner that is discriminatory and unfair." *Id*. at 1340. The issue of whether the Congress intended Section 8(i) to pre-empt state laws related to requests for the entire voter file much less preclude states from charging fees for requests for the entire voter file was not before the court. *Id*. at n. 24 ("Plaintiff's Requested Records do not seek the Database, and, to the extent Plaintiff previously sought the Database, that issue is not now before the Court.").

In the line PILF quotes out of context, "Congress intended states to shoulder the burden," the court in *Kemp* was responding to Georgia' argument that it would be unduly burdened if made to disclose those voter registration records at all because the Georgia contracted with a third-party vendor to maintain the database and so the request would harm the State. *Id*. at 1351. It is a long recognized principle that the Elections Clause requires states to implement Congress's superseding regulations without compensation from the federal government. *See Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012), aff'd sub nom. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 133 S. Ct. 2247, 186 L. Ed. 2d 239 (2013). That general principle does not preclude a state from creating a schedule of reasonable charges for production of the entire statewide voter roll when Congress has created no express prohibition against the practice.

c.  **There is no Conflict Between New Mexico's Uniform Data Fee Schedule and NRVA's Purpose**

Conflict preemption isn't present merely because a state law operates in the same general area of a federal election law. As the term implies, conflict preemption applies only in situations "when it is impossible for a private party to comply with both sate and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Herrera*, 690 F.Supp.2d 1183, 1206 (internal citations omitted). And, of course, if a state law can operate in harmony with Congress' objectives in enacting the NVRA or even serves the same purpose, there is no conflict preemption. In *Herrera*, this court dismissed a conflict preemption claim brought by four non-profit organizations challenging a New Mexico statute regulating their voter registration efforts. *Id.* at 1226. There, the state added registration restrictions beyond those found in the NVRA, requiring third party voter registration agents to pre-register and attend a training. *Id.* at 1189. The court reasoned that NMSA § 1-4-49 "arises from a desire to protect the process of voter registration from fraud and error, which directly aligns with NVRA's stated objective to protect the integrity of the electoral process and ensure that accurate and current voter-registration rolls are maintained" and recognized the intent of avoiding mistakes in voter registration efforts was not a suppression of voter registration or voter turnout. *Id.* at 1226.

An acknowledgment of what Congress <u>did not intend</u> with the enactment of NVRA is also informative to a complete conflict preemption analysis. For example, the district court for the Southern District of Mississippi found that Congress's stated purpose in enacting NVRA "concerned voter registration" and rejected arguments that NVRA was an invitation for third parties to conduct election auditing and monitoring or that Section 8(i) entitled parties to demand information related to those purposes:

> Congress did not express the purpose of regulating States' supervision of individual elections, or enacting procedures to ensure the integrity of a particular round of balloting per se… In enacting the NVRA, Congress gave no indication that it intended to either supplement other Federal laws or preempt State laws concerning the election process. The NVRA establishes a uniform code for voter registration and removal. The Court declines to adopt Plaintiffs' interpretation of the NVRA Public Disclosure Provision in a manner that would turn it into a post-election discovery device for detecting voter fraud.

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 721-722 (S.D. Miss. 2014).

PILF raises no issue with any of the regulations enacted by the NMSOS pursuant to the NVRA. *See* NMCA 1.10.8.1 thru 1.10.8.18, "Procedures for State Agency-Based Voter Registration Under the National Voter Registration Act of 1993." Instead, the regulation that PILF implicitly contends is preempted by Section 8(i) is part of the "rules to establish and administer the statewide computerized voter registration system…" NMCA 1.10.35.1. Specifically, NMCA 1.10.35.10 states "[t]he secretary of state shall develop a uniform fee schedule for data recording media, voter data, voter lists, special voter lists, precinct lists, printed labels, and early and absentee daily voting reports. County clerks may require a deposit for any data requested." NMCA 1.10.35.10(B). This mandate for uniformity prevents local and state officials from treating parties making voter file and other data requests in a disparate manner and ensures that all requesters have equal access to data regardless of how complicated or simple their requests may be. This regulation helps ensure consistent access to the voter data and compliance with HAVA through both lean and robust budget years and no matter who is elected to the office. The intent of equal and consistent access poses no conflict or obstacle to the NVRA's purposes of increasing voter participation and protecting the accuracy of the voter rolls.

Additionally, in cases where courts have found that the circumstances justified the production of the entire voter roll or other registration records that include sensitive information,

they limited their rulings to exclude the disclosure of information that would violate other Federal and State statutes. *Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021) (This general principle articulated in Project Vote, however, does not require automatic disclosure of all categories of documents requested by the Foundation in the present case.); *See also Pub. Int. Legal Found., Inc. v. Way*, No. CV 22-02865 (FLW), 2022 WL 16834701, at *5 (D.N.J. Nov. 9, 2022) ("Although Plaintiff is correct that the NVRA's disclosure provision is broad and does not contain an explicit exemption from disclosure for sensitive information subject to potential abuse, I also find that the term 'all records' in the disclosure provision 'does not encompass any relevant record from any source whatsoever, but must be read in [context] with the various statutes enacted by Congress ....') (quoting *Pub. Interest Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021).

PILF points to no evidence indicating that Congress intended to create a situation where state and local election officials could be stretched beyond their budgetary limits by anyone who wished to demand copies of the entire voter roll, or complex and precisely crafted pieces of the voter roll, as often as they wish, for free, and pretend that there is no overhead involved if their request is electronic rather than hard copy. New Mexico's fee schedule helps ensure access as well as compliance with a wide variety of state and federal laws. Maintaining this access and consistency depends upon both annual technological investments and trained staff. Ultimately, PILF is arguing that Congress intended that local and state election officials engage in time consuming and detailed redaction of the voter file prior to production but a state can only charge for that work if the voter roll is printed on paper rather than produced electronically. But they are also implicitly arguing that because their request was relatively simple and in electronic format,

they should receive preferential pricing compared to a candidate running for the local school board in a small town in rural New Mexico who makes a narrower, but more complicated and time-consuming request for a specific subset of the Voter Roll.

PILF's conflict preemption argument also fails, in part, because it requires the court to imply a purpose not evidenced in the NVRA, that every household have the ability to audit state voter files. Citing to the median household income in New Mexico, PILF presents the theoretical argument that NM's data fees may limit the number of average households that "will monitor the Secretary's voter list maintenance programs." Doc. 37, at 22. However, the plaintiff in this case is a sophisticated and well-funded nonprofit headquartered in Washington, DC with a team of litigators with decades of combined experience making more than six figures each, and income of more than three million, two hundred thousand dollars ($2,000,000.00) per year according to their last published IRS 990; not an average New Mexico household.[2] PILF has listed no witnesses in their disclosures who are average New Mexicans lamenting a lack of access to the voter file due to the fee schedule nor have they offered any evidence that such a problem even exists in this state. Even if they could offer such a witness, there is no evidence of a Congressional concern or purpose in NVRA that the average citizen should monitor the voter registrations of their neighbors.

Decades after its passage, PILF asks the court to craft a nonexistent Congressional purpose for NVRA that courts have disavowed – turning Section 8(i) into an election and voter roll monitoring or auditing provision whereby the accuracy of the voter list can be crowd sourced. The case PILF points to as instructive on conflict preemption, *Judicial Watch, Inc. v. Lamone,* does not

---

[2] *See* PILF's 2021 IRS Form 990, available from the IRS website at https://apps.irs.gov/pub/epostcard/cor/454355641_202112_990_2023031521121808.pdf (last accessed February 1, 2024).

support this argument that the NM fee schedule serves as an obstacle to a silent Congressional intent to make voter rolls available to everyone for free so they can search for mistakes. In *Judicial Watch,* the court found that the Maryland law was "preempted in so far as it allows only Maryland registered voters to access voter registration lists." *Jud. Watch, Inc. v. Lamone,* 399 F. Supp. 3d 425, 445 (D. Md. 2019). The reasoning underlying the conflict preemption was "[o]rganizations such as Judicial Watch and Project Vote have the resources and expertise that few individuals can marshal. By excluding these organizations from access to voter registration lists, the State law undermines Section 8(i)'s efficacy." *Id*. Here, we have the opposite circumstances. New Mexico law expressly allows PILF to access the Voter File but conditions that access on what is a nominal fee for an organization with such resources and expertise. And that organization, in turn, is arguing that the law conflicts with the purpose of the NVRA because that charge may be too expense for an average New Mexican household – a hypothetical controversy that is not present in this case.

**4.   The question of what qualifies as a "reasonable cost" pursuant to Section 8(i) is Undisputed Because PILF has Failed to Offer Evidence or Expert Opinion Regarding What Would Be a Reasonable Cost, Instead Insisting that Congress Mandated the Electronic Voter Roll be Provided Completely Free of Charge**

Normally, a factual question of precisely what type of fee schedule would qualify as a "reasonable charge" would create a disputed question of fact for trial on the merits. However, PILF has taken the extreme position that Congress intended to preempt all charges if a voter file request is electronic. Therefore, if the court rejects their legal argument that Section 8(i) preempts New Mexico's fee schedule, there are no remaining issues to consider.

If the court finds that Section 8(i) does preempts New Mexico's fee schedule for production of the entire voter file, then the remaining question is what is a "reasonable charge" pursuant to the NVRA? PILF has offered no evidence or expert opinion regarding what a reasonable fee would

be other than insisting that Congress intended it to be produced free of charge. Therefore, there is no genuine dispute of material fact as to whether NM's fee schedule is reasonable and the court may find summary judgment in favor of the NMSOS.

In the alternative, the factual question of what is a "reasonable charge" is disputed. PILF refers, in isolation, the Secretary of State's discovery answers estimating the maximum number of hours spent "responding to a request for the Voter File in electronic format" to conclude that "the Secretary is charging requestors more than $1,100 per hour in personnel costs to receive one copy of the Voter File in electronic format." Doc. 37 at 25. But Interrogatory No. 3 and the NMSOS's answer relates solely to a simple request for the entire voter file such as PILF's. However, PILF did not ask whether that is the only type of voter file request the NMSOS receives nor did they ask about the wide variety of other types of requests have to be fulfilled under NMCA 1.10.35.10. Requests come in all shapes and sizes. Many requesters, such as candidates for local office around the state and political advocacy groups, are focused on a small segment of the voting population and so their requests may be limited by geography, party affiliation, voting history, and even neighborhood. These seemingly "small" requests can require days of database programming by IT staff to prepare and run accurately.

There are also a wide variety of other overhead costs associated with maintaining the Voter File in a manner that allows for it to be produced in a timely manner upon request. To name just one, independent of the original investment New Mexico had to make to establish a centralized voter roll, the NMSOS has to spend $144,000 - $160,000/year for ongoing SERVIS maintenance and support to maintain the voter file so that it can be produced accurately in response to requests. *See* Additional Material Fact A and **Exhibit 1.** In addition to these vendor services to maintain the

database, accessibility doesn't happen without facilities, infrastructure, and staff to maintain the physical equipment. PILF never asked for a comprehensive list of all of the costs associated with making the Voter File consistently accessible.

**THE COURT MAY FIND**
**SUMMARY JUDGMENT FOR THE NONMOVANT, OLIVER**

PILF fails to present any basis for summary judgment against Oliver but the court may go beyond mere denial of their motion and enter summary judgment in favor of Oliver under Fed. R. Civ. P. 56(f). Specifically, the court may rule, as a matter of law, that the public disclosure provision of the NVRA does not preempt New Mexico's fee schedule.

District courts "possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.'" Bruton v. United States, CIV 11-0330 WJ/KBM, 2012 U.S. Dist. LEXIS 197393, at *3 (D.N.M. Sep. 5, 2012) (Johnson, CJ.) (quoting *Celotex v. Catrett*, 477 U.S. 317, 326 (1986)); see also *Tex. Prod. Credit Ass'n v. McCurtain Cnty. Nat'l Bank*, 222 F.3d 800, 816 (10th Cir. 2000) ("entry of summary judgment sua sponte is warranted only when . . . : (1) there is no dispute of material fact; and (2) the losing party has had adequate opportunity to address the issues involved . . .") (citation omitted). Although this appears to suggest the Court must grant PILF an additional opportunity to address Oliver's arguments, they have already had an opportunity by filing their motion and will have another opportunity in replying to this response.[3]

---

[3] See Shavo Norgren (India) Private Ltd. v. C.A. Norgren Co., Civil Action No. 05-cv-00538-EWN-CBS, 2006 WL 2226212, 2006 U.S. Dist. LEXIS 54077, at *49 (D. Colo. Aug. 3, 2006) ("[U]nlike the textbook situation where summary judgment is granted against a non-moving party, here, Plaintiff itself has filed a motion for summary judgment on its tort claims, and thus, has had not one, but two opportunities to marshal evidence and brief the issues in support its own argument that it was entitled to summary judgment.").

**CONCLUSION**

WHEREFORE, Defendant respectfully requests that the court,

1. Grant summary judgment for Oliver, dismissing PILF's Counts I and II, finding, as a matter of law, that the NVRA does not preempt NMCA 1.10.35.10(B); or

2. Deny summary judgment for PILF because whether NM's fee schedule is a reasonable charge under Section 8(i) of the NVRA is disputed.

Dated: February 2, 2024.

Respectfully Submitted:

**RAÚL TORREZ**
**New Mexico Attorney General**

By: */s/ Rose Bryan*
Kathleen Rosemary Bryan
Assistant Attorney General
NM Department of Justice
(f/k/a The New Mexico Office of the
Attorney General)
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
rbryan@nmag.gov

*Counsel for Maggie Toulouse Oliver, in*
*her official capacity as Secretary of State*
*of New Mexico*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2024, I filed the foregoing document electronically via the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


*/s/ Rose Bryan*